SEALED

FILED

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Eastern District of California

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

FEB 16 2018

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Michael Smith | ) | Case No. 2:18 - MJ - 44   EFB |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 4, 2018 _____ in the county of _____ Placer _____ in the
_____ Eastern _____ District of _____ California _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Unlawful Dealing and Manufacturing in Firearms |
| 26 U.S.C. § 5861(d) | Unlawful Possession of an Unregistered Firearm |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT OF HSI SPECIAL AGENT ARON MANN

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Aron Mann, HSI Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: _____ 02/14/2018 _____

_____
_Judge's signature_

City and state: _____ Sacramento, California _____

United States Magistrate Judge Edmund F. Brennan
_Printed name and title_

# AFFIDAVIT

I, Aron Mann, being duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.    I am a special agent with Homeland Security Investigations ("HSI") and have been so employed since June 2016.  As a requirement for employment as an HSI Special Agent, I successfully completed the Criminal Investigator Training Program ("CITP") located at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  At the conclusion of CITP, I completed an additional Homeland Security Investigations Special Agent Training Academy.  As part of the training at FLETC, I received extensive instruction in the areas of immigration law, customs law, illegal narcotics, firearms, surveillance, and interview techniques.  As a Special Agent with HSI, I investigate, among other things, illegal narcotics trafficking and cyber-crimes.  Moreover, as an HSI special agent, I am a "Federal Law Enforcement Officer," authorized to investigate violations of the laws of the United States and to execute search and seizure warrants issued under the authority of the United States.

2.    I have conducted and participated in criminal investigations for violations of federal and state laws including, but not limited to, narcotics trafficking, child exploitation, money laundering, firearms, fraud, and other organized criminal activity.  I have prepared, executed, and assisted in numerous search and arrest warrants.  I have also conducted and participated in criminal and administrative interviews of witnesses and suspects.  I have also had training and experience with various firearms including handguns, shotguns, and rifles, and have conferred with firearms instructors and other law enforcement agents and officers who are familiar with various firearms and/or who specialize in violations of laws pertaining to firearms.

## II.   PURPOSE

3.    The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Rather, this affidavit serves to establish probable cause for:

> a.  A criminal complaint against MICHAEL SMITH ("SMITH") for violation of 18 U.S.C. § 922(a)(1)(A) (dealing/manufacturing firearms without a license) and 26 U.S.C. § 5861 (possession/transfer of an unregistered firearm).

> b.  A warrant to search the locations described in Attachment A as well as the seizure of the items described in Attachment B.

# III.   OVERVIEW

4.     During this investigation, an undercover HSI agent (the "UCA") posed as a firearms vendor on the "dark web." From on or about October 5, 2017, up to and including February 5, 2018, SMITH, using the online identity "BrotherBig," contacted the UCA and discussed the purchase of grenades, anti-personnel mines, and explosives; negotiated the sale of "ghost" AR-15 short-barreled semi-automatic rifles; and finally, sold eight AR-15 short-barreled semi-automatic rifles to the UCA. Seven of the eight AR-15s SMITH sold to the UCA contained 80% lower receivers that SMITH completed himself using a drill press, and the eighth AR-15 bore an obliterated serial number. In doing so, SMITH is:

    a.   Manufacturing and selling firearms without a license to do so from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").
        i. Under 18 U.S.C. § 922(a)(1)(A), "[i]t shall be unlawful for any person – except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms."

    b.   Manufacturing and selling firearms that are illegal to possess, such as a short-barreled rifle, a machine gun, or a silencer.
        i. Under 26 U.S.C. § 5845, the term "firearm" includes: (1) "a rifle having a barrel or barrels of less than 16 inches in length;" (2) "a machine gun;" and (3) "any silencer."
        ii. Under 26 U.S.C. §§ 5801-5871, for all firearms (as defined in Title 26):
            1. It is prohibited to make such a firearm without filing a written application with the Secretary of the Treasury.
            2. It is prohibited to transfer such a firearm without the approval of the Secretary of the Treasury.
            3. It is prohibited to possess such a firearm unless the firearm is registered and contains a serial number.

    c.   Manufacturing and selling firearms without any identifying information, such as a serial number, that can be used to trace the weapon if it is involved in a crime.
        i. Under 18 U.S.C. § 923(i), "licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe."
        ii. Under 18 U.S.C. § 922(k), "it shall be unlawful for any person to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce."

# IV.   TECHNICAL BACKGROUND

*Definition of a "Firearm"*

5. A "firearm" is "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," 18 U.S.C. § 921(a)(3)(A). This definition includes "the frame or receiver of any such weapon," 18 U.S.C. § 921(a)(3)(B), and "any combination of parts either designed or intended" from which a firearm can be "readily assembled." 18 U.S.C. § 921(a)(4)(C). A "receiver" under 18 U.S.C. § 921(a)(3)(B) includes a "lower receiver."

*The AR-15 Rifle*

6.     An AR-15 is the semi-automatic, civilian-version of the .223-caliber M16 machine gun used by the United States military. Although AR-15 refers to the model produced by Colt (firearms manufacturer), the term "AR-15" is colloquially used to refer to firearms similar to, and based upon, the Colt AR-15. An example of an AR-15-style rifle is depicted below. This image is from ATF's "Police Officer's Guide to Recovered Firearms," accessible at http://www.atf.gov/files/publications/download/p/atf-p-3312-12.pdf.



*Photo 1 - AR-15 rifle (photo unrelated to this case)*

///

///

///

///

7.     An AR-15-style rifle consists of many parts. There five main parts are: the (1) lower receiver; (2) upper receiver; (3) stock; (4) barrel; and (5) magazine. These parts are labeled below.



**Photo 2 – AR-15 rifle (labeled) (photo unrelated to this case)**

8.     Most parts for a firearm (e.g. stocks, barrels, magazines) are not subject to regulation by ATF. Accordingly, these parts are often made by individuals and small businesses. For the most part, these gun parts can be bought and sold without reporting the sales and without requiring a background check.

9.     The lower receiver is different than common gun parts. As discussed in Paragraph 5 above, a lower receiver is considered a "firearm." That means that the lower receiver, without any other parts at all, is regulated and controlled by ATF the same way as a completed firearm (for example, the AR-15-style rifle depicted above). This also means that the manufacture, sale, transfer, and disposition of lower receivers are regulated by ATF. Depicted below is a lower receiver for an AR-15-style rifle.



**Photo 3 – AR-15 lower receiver (photo unrelated to this case)**

10. To manufacture an AR-15 lower receiver, a manufacturer may start with an AR-15 blank. Depicted below is an AR-15 blank. An AR-15 blank is not considered a "firearm" by ATF. An AR-15 blank is a metal casting that is eventually converted into an AR-15 lower receiver by a manufacturing process.



**Photo 4 – AR-15 blank (photo unrelated to this case)**

   a. An AR-15 blank is also colloquially referred to as a "blank," an "80%," an "80% blank," an "80% lower," or an "AR-15 80%." These terms developed based on the perception that the piece of metal was 80% of a firearm, and therefore unregulated by ATF. The term "80%" and variations of it are not used by ATF and are not officially recognized by ATF. ATF regulates "firearms." An item that is not a "firearm" is not regulated by ATF and not assigned an official terminology.

11. An AR-15 blank is converted into an AR-15 lower receiver through the use of specialized tools, typically a drill press or a computer numerical control machine ("CNC machine"), and precision measurement equipment. A CNC machine is an automated version of a drill press that is run by a computer. A drill press is operated by hand. A CNC machine is operated by running a computer program that automates the process.

12. Using either a drill press or a CNC machine, the equipment operator drills, cuts, or mills cavities in specific locations on the AR-15 blank. This process transforms the AR-15 blank into an AR-15 lower receiver by creating the precise shape and space necessary for the lower receiver to accept the parts that will allow the firing of a projectile. These shapes or cavities must be created to the exact specifications required. If these cavities are not formed to the exact specifications required, the firearm will not function and may break. This process also creates the holes necessary to attach the upper receiver and barrel to the lower receiver. These parts (e.g. the hammer, bolt or breech-lock, and firing mechanism) are the internal mechanical parts, that combine with a trigger, firing pin, and other parts to form a functioning firearm.

13.    This investigation deals with the manufacturing of AR-15-style lower receivers. In this case, SMITH acquired AR-15 blanks (unregulated, metal castings) and transformed them into AR-15 lower receivers (regulated firearms) and then assembled fully functional AR-15 rifles (regulated firearms). Unlike a firearm manufactured by a licensed manufacturer, these firearms are completely untraceable. They have no serial number. They have no manufacturer identification. Further, these firearms are sold by unlicensed individuals with no regard to the prohibited status of the purchaser, or the legality of the firearm itself.

### Federal Firearms License

14.    A person who manufactures and sells firearms is required to hold a federal firearms license ("FFL") in accordance with 18 U.S.C. § 923(a). As an FFL, the licensee is required to mark the firearms the FFL manufactures in accordance with 18 U.S.C. § 923(i) and its implementing regulation at 27 C.F.R. § 478.92, which prescribes the identifying markings (including serial number and manufacturer name) and the manner in which each firearm is to be marked. Additionally, 18 U.S.C. § 923(g)(1)(A) and its implementing regulation at 27 C.F.R. § 478.123 prescribe record keeping requirements to require the licensee to record specified information regarding the firearms manufactured and information to whom the firearms are transferred.

        a.   In this particular case, SMITH is operating without a license.

15.    Upon transfer of a firearm to a person who does not hold an FFL, the licensee transferring the firearm is required to execute a Firearms Transaction Record (ATF Form 4473) and initiate a background check on the non-licensed individual in accordance with 18 U.S.C. § 923(g)(1)(A) and 18 U.S.C. § 922(t) and their implementing regulations at 27 C.F.R. §§ 478.124 and 478.102.

        a.   In this particular case, firearms are being sold without a license, being sold without filling out an ATF Form 4473, and without conducting a background check.

16.    The requirements to hold an FFL apply to any person who is engaging in the business of manufacturing and/or selling firearms. This has created a loophole that permits an individual to manufacture a firearm for personal use without first obtaining an FFL, provided the firearm is not for sale and the person who made the firearm is not otherwise prohibited from possessing firearms. This loophole only applies to personal use. Thus, only an FFL can manufacture a firearm for sale or transfer.

*Background of Bitcoin*

17. Based on my training and experience, I know the following about Bitcoin:

    a. Bitcoin is a virtual currency, existing entirely on the Internet and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operation on a decentralized, "peer-to-peer" network. Bitcoin transactions are recorded on the "blockchain." The blockchain is a shared public ledger on which the entire Bitcoin network relies. All confirmed transactions are included in the blockchain. This way, Bitcoin wallets can calculate their spendable balance and new transactions can be verified to be spending Bitcoins that are actually owned by the spender. The integrity and the chronological order of the blockchain are enforced with cryptography.

    b. Bitcoin mining is the process by which transactions are verified and added to the blockchain, and also the means through which new bitcoins are released. Individuals who run the mining software, competing against each other to set up each new block in the chain, are known as "miners." Each new block currently releases 12.5 Bitcoins to its miner.

    c. To acquire bitcoins without mining, a user typically purchases them from a Bitcoin exchanger. Bitcoin exchangers typically accept payments of fiat currency (currency which derives its value from government regulation or law), or other convertible virtual currencies. A user will normally send or provide payment in the form of fiat or other convertible virtual currency to an exchanger, usually via wire or ACH, for the corresponding number of bitcoins based on a floating exchange rate. The exchanger, often for a commission, will attempt to broker the purchase with another user on the exchange that is trying to sell Bitcoins.

    d. In order for a user to acquire Bitcoins, they must be sent to the user's Bitcoin address. This address is an alphanumeric string whose use is somewhat analogous to a bank account number. The user can then conduct transactions with other Bitcoin users, by transferring bitcoins to their Bitcoin addresses, via the Internet.

    e. Little to no personally identifiable information about the payer or payee is transmitted in a Bitcoin transaction. Only the Bitcoin addresses of the parties are needed for the transaction, which by themselves do not reveal any identifying information.

f. Bitcoin is not inherently illegal and has known legitimate uses, much like cash; Bitcoins, however, are also used to facilitate illicit transactions and to launder criminal proceeds, given the ease with which they can be used anonymously, again like cash.

*Background of Dark Web Marketplaces*

18. The World Wide Web is divided between the Surface Web and Deep Web. The Surface Web (also called the Visible Web, Clearnet, Indexed Web) is that portion of the World Wide Web that is readily available to the general public and searchable with standard web search engines (Google, Bing, etc.). The Deep Web, which contains the Dark Web, is the content on the World Wide Web that is not indexed by standard search engines. The Dark Web is classified as a small portion of the Deep Web that has been intentionally hidden and is inaccessible through standard web browsers. The most famous content that resides on the Dark Web is found in the TOR network.

19. The TOR network is an anonymous network that can only be accessed with a special web browser, called the TOR browser. TOR stands for "The Onion Router," a reference to the many layers in an onion. This is the portion of the World Wide Web most widely known for illicit activities because of the anonymity associated with the TOR network. The vast majority of goods for sale on Dark Web Marketplaces consist of illegal drugs, of nearly every variety, openly advertised on the site and prominently visible. In addition to illegal drugs, Dark Web Marketplaces openly advertise child pornography, identity documents, firearms, and other contraband or regulated products. Silk Road, Dream, Hansa, and AlphaBay are examples of Dark Web Marketplaces known to law enforcement that previously or currently market illicit goods and activities. Bitcoin is the most common and widely accepted form of payment for illicit activities on the Dark Web.

## V.    FACTS ESTABLISHING PROBABLE CAUSE

### A. BrotherBig contacts HSI UCA

20. On or about October 5, 2017, an individual using the email address "Brotherbig@protonmail.com" ("BrotherBig") contacted an undercover email account utilized by an HSI UCA operating as a Dark Web firearms vendor, and expressed interest in receiving a list of items the UCA had for sale. "ProtonMail" is a Swiss-based encrypted email provider utilized by individuals who want to preserve their anonymity on the Internet. BrotherBig wrote the following: "Hello. I am brotherbig. I understand you are in the market for some trades. I am enamored of fine weaponry. I don't know exactly how to start correspondence with you besides

to say I love to build collect reload and use all sorts of firearms. Might you have a list of items and prices you stock?"

21.   Again on or about October 5, 2017, in a follow-up email, BrotherBig wrote: "… Would you like to start small then for bitcoin or would you like to do a trade for just one of my ghosts for ? This is the way I have built some solid trust with others in the past …" and, "I assume you use USPS and reside within the U.S. like myself?" In a reply email the UCA wrote: "… Ghosts? Do you mean 80% builds for a trade? Ghosts threw me, are you looking to sell or buy or trade? Polymer builds are something I always want …" BrotherBig wrote back: "I respect your desire to remain anonymous! I agree and condone pgp security. Just for curiosity why polymer and not 6061 aluminum? I have built so very many of both …" "PGP" refers to Pretty Good Privacy, an encryption protocol and software used to anonymize electronic communications. Only the holder of an encryption "key" can decipher a message intended for them.

### B. BrotherBig expresses interest in grenades, landmines, and explosives

22.   In another email reply to the same thread above, BrotherBig wrote: "Also I always test fire every weapon to guarantee functions 100%. What quantity polymer lowered rifles were you looking for approximately? … I am interested in fragment and incendiary grenades and other types of anti personnel, claymore, c4 with detonator inserts if possible and the like. I also have premium marijuana. If you are into that as well to barter."

23.   On or about October 13, 2017, in a follow-up email, BrotherBig wrote that he could finish 80% lowers or build full rifles for a set price each. BrotherBig went on to state that he would sell the rifles for Bitcoin or trade for anti-personnel explosives, and expressed interest in utilizing a dead-drop "geocached" location to complete a transaction. BrotherBig then wrote: "I am in nor cal usa." A geocache involves placing items at a location, usually buried or hidden outdoors, and providing the Global Positioning System ("GPS") coordinates to the individual who would then retrieve the items. The UCA declined using GPS as he would have no proof of delivery.

### C. BrotherBig tentatively identified as Michael SMITH

24.   On or about October 13, 2017, in a reply email to the above thread, BrotherBig wrote that he utilized Coinbase to transact Bitcoin. Coinbase is a digital currency exchange based in San Francisco, California.

25.   On October 13, 2017, I searched for the text strings "BrotherBig" and "Brother Big" on publicly available PGP key servers, in an effort to identify any matching PGP keys used to encrypt communications. From this search I located three PGP keys bearing the name "Brother

Big" with the following emails attached: "458winchestermag@protonmail.com," and "458winchestermagnum@protonmail.com." Since BrotherBig mentioned Coinbase in his email, I contacted Coinbase to inquire about any accounts that contained the name "Brother Big" or the above-mentioned email addresses.

26.    On October 16, 2017, Coinbase returned the results of the account search, with a matching result for both the name "Brother Big" and the email address "458winchestermagnum@protonmail.com." The aforementioned account was registered to "Mike Smith" of 14793 Towle Lane, Grass Valley, CA 95945. Additional account details revealed a California Driver License number of XXXXX852 and a telephone number of "530-802-1509." A debit card attached to the account bore the name of "Julie Smith."

27.    I performed a Google search on the names "Michael Smith" and "Julie Smith" in "Grass Valley" and located an online news story that detailed an October 2015 arrest wherein Michael and Julie Smith were arrested for poaching a deer from their vehicle at or about 2:30 am in Nevada County, California. I then located the arrest records for this incident and validated the matching Driver License number for SMITH found on the Coinbase account.

### D.  BrotherBig and HSI UCA negotiate the sale of four AR-15s

28.    From about October 26, 2017 through November 6, 2017, BrotherBig (hereinafter referred to as SMITH) and the UCA negotiated the price of four short-barreled AR-15s through the established email thread, agreeing on a $4,400 USD total payment, with $2,000 down payment and the rest to be collected on delivery. The UCA sent $2,000 USD in Bitcoin to the Bitcoin address provided by SMITH. SMITH confirmed he received the Bitcoin payment and inquired if the HSI UCA was law enforcement "… looking to make an example of folks of my sort," adding "do you represent any department or branch of law enforcement in any way shape or form ?. Forgive my paranoia. Please help ease my doubt."

29.    On or about November 7, 2017, the UCA inquired via email about when he should check on the progress of the rifles. SMITH replied that "… all parts were in stock and they are ordered. Waiting for those will eat up the first of the two weeks I have aloted for this …"

### E.  Surveillance on 14793 Towle Lane, Grass Valley, CA

30.    On November 7, 2017, I conducted surveillance at the residence of Michael SMITH, located at 14793 Towle Lane, Grass Valley, CA ("SUBJECT PREMISES.") At the SUBJECT PREMISES, two vehicles were observed parked next to the house: a White Ford Expedition and a Tan/Gold Toyota Highlander. I then contacted the Nevada County Sheriff's Office ("NCSO") and inquired about any vehicles registered to Michael or Julie SMITH at the SUBJECT

PREMISES. NCSO reported that two vehicles were registered to Julie SMITH: a 1997 Ford utility vehicle bearing California license plate "7NAA603," and a 2003 Toyota utility vehicle bearing California license plate "5BWH912."

### F. SMITH reiterates interest in grenades and explosives

31.    On or about November 8, 2017, SMITH replied to the established email thread and stated: "Respectfully of course, the prices on your ordinance seemed a tad high, if memory serves me right the armory. Onion site shows frags and incendiary grenades at 300 each, while they did not boast a claymore or c4." "The Armory" was a TOR Dark Web Marketplace that purported to specialize in black-market firearms and explosives. The UCA replied that The Armory was a scam website and possibly a law enforcement honeypot, to which SMITH replied: "Yes I never tried to order from there, it was abundant with risk that is unacceptable to me. I really don't have any other resource to get the going rate for the good stuff! ..."

### G. SMITH and HSI UCA discuss meeting location and purchase specifics

32.    On or about November 12, 2017, SMITH and the UCA began negotiations on a time and place to meet for the purchase of the four short-barreled AR-15s built by SMITH. During these email exchanges SMITH provided the UCA a "burner" phone number at which he could be reached: 530-213-0141.

33.    On or about November 18, 2017, SMITH notified the UCA that the rifles were complete and "cycled perfectly." SMITH sent the UCA a photo of the four rifles in a spray foam-lined crate.

34.    SMITH and the UCA continued negotiations on a time and place to meet and exchange the rifles for the remainder of the Bitcoin. During the exchange, the UCA notified SMITH that the sights were installed backwards on the rifles in the photo provided by SMITH. SMITH stated that "... I had my woman hanging out with me in the shop 'helping out' I can't believe I didn't catch that before I mailed pic to you ..." SMITH went on to say that "... I can and would be happy to do more for you. I am currently capable of 1 to 2 a day. It always takes a week to get all the parts ordered and delivered, as long as there are no backordered or delayed problems," and "The builds are solid and tested with 30 rds each."

35.    On or about November 27, 2017, SMITH emailed the UCA, stating "My wife just reminded me I have a doctor's apt Friday so do you think sat would be okay?" SMITH and the UCA finally agree on a meeting time of December 1, 2017, at 4:00 pm at the Bass Pro Shops in Rocklin, CA.

### H. SMITH and HSI UCA complete first trade of AR-15s for Bitcoin

36. On December 1, 2017, law enforcement established surveillance at the SUBJECT PREMISES. In addition to the aforementioned identified vehicles belonging to the SMITH family, agents observed a U-Haul rental van on the property.



**Photo 5 – U-Haul van at SUBJECT PREMISES**

37. Agents observed both SMITH's Toyota Highlander and the U-Haul van leave the property and drive directly to the Bass Pro Shops parking lot where the agreed upon meet was to take place. SMITH parked the U-Haul van, exited, and entered the Toyota Highlander. The Highlander then drove to a medical complex located at or about 406 Sunrise Avenue, Roseville, CA 95661. Previously, SMITH told the UCA that he had a doctor's appointment on the day of the meet. Agents observed a white female driving the Highlander and waiting on SMITH to return to the vehicle.

38. SMITH and the female returned to the area of the Bass Pro Shops and eventually SMITH exited the Highlander alone and met the UCA at the Starbucks coffee shop located in the same shopping plaza. SMITH introduced himself to the UCA as "Marcus." SMITH told the UCA that the rifles were nearby and they could meet at the location where the rifles were and finish the transaction. SMITH and the UCA made small talk about Bitcoin and Dark Web deals, and milling 80% lowers. SMITH said that he is able to mill polymer 80% AR-15 lowers, and that he has shipped out completed lower receivers in the past. SMITH and the UCA discussed SMITH ordering the parts for the AR-15 builds and began negotiations for future AR-15 rifles. SMITH told the UCA to meet him at a U-Haul van down by Bass Pro Shops.

39. The UCA drove down to the U-Haul van and met SMITH, at which time SMITH told the UCA that the rifles were in the rear of the U-Haul van. The UCA retrieved the rifles from the van, located inside a wooden crate, and placed them into the UCA's vehicle. None of these firearms were registered nor contained a serial number (one was obliterated). No ATF paperwork or background checks were completed.

40. The wooden crate was lined with spray foam, as seen in the photo sent by SMITH previously during the email conversation. The UCA sent the remainder of the Bitcoin payment to a Bitcoin address provided by SMITH. The UCA asked SMITH if he had the Bitcoin scannable "QR" code on his phone to make the transaction easier, but SMITH said he did not bring his phone since he did not want to have it on him in case there were federal agents waiting for him. A "QR" code is a two-dimensional barcode that allows for facilitating easier Bitcoin transactions rather than typing out the alphanumeric Bitcoin address.

41. SMITH asked the UCA "so are we gonna do four more bro?" The UCA replied that he needed to check out the current set of rifles first before proceeding with another order. SMITH then said "that's so awesome that you turned out not to be a fucking cop, I can't tell you how fucking happy I am about that." SMITH and the UCA spoke about the grenades, landmines, and explosives that SMITH inquired about, and discussed prices on bulk orders, or trading them for firearms provided by SMITH. SMITH said he wanted to receive a sample of the explosives to try out, and said he had a place out in the mountains where he could test them. SMITH said that he quit his job to take care of his wife, and building and selling rifles has been good financially for him.

42. SMITH and the UCA parted ways. SMITH entered the U-Haul van and drove to where the Toyota Highlander was parked, pulled next to it, and both the U-Haul van and the Highlander driven by the white female left the area.



**Photo 6 – SMITH at the first meeting**



Photo 7 – Four short-barreled "ghost" AR-15s received from SMITH



Photo 8 – Obliterated serial number on Stag Arms AR-15 received from SMITH

43.    On December 1, 2017, following the meet, SMITH sent the UCA an email stating "… You have earned my respect also I love what you do. If you ever need anything else like someone to do a pickup or whatever feel free to ask and just know if you could ever count on a stranger . Brotherbig is here." The UCA replied that he was fine and did not have any encounters with law enforcement. SMITH replied that the UCA had nothing to worry about since SMITH despised law enforcement.

44.    The UCA confirmed that the individual he purchased the AR-15s from was indeed SMITH, as seen in SMITH's Department of Motor Vehicles photo and other photos of SMITH shown to the UCA.

45.    All four rifles were sent to the United States Immigration and Customs Enforcement's Office of Training and Tactical Programs Armory Operations Unit ("OTTP") where they underwent examination and testing. All four rifles test-fired successfully, and all four barrels measured in at 10.75 inches, meeting the definition of a short-barreled rifle per 18 U.S.C. § 921(a)(8).

### I.    SMITH and HSI UCA negotiate a second purchase of four short-barreled rifles

46.    On or about December 2, 2017, the UCA emailed SMITH and stated that he would be in touch soon about the next order of four polymer AR-15s. SMITH replied that the order could be done in two weeks or less, and that the first week is taken up just waiting for parts to arrive, and after that he can manufacture one to two per day. SMITH replied that he was looking for parts online for the next order of rifles, and asked the UCA if the barrels could be shorter the next time, by an inch or two, as it would simplify things for him. SMITH asked if the UCA wanted another meeting or if SMITH should ship the items to the UCA, writing: "… I am very good at shipping items of this nature. I am experienced with the USPS and the methods required to obtain a proper degree of stealth, so my packs travel unnoticed and do not get red flagged." The UCA replied that he would pick them up again since there is trust between the two.

47.    On or about December 6, 2017, SMITH wrote to the UCA in an email stating that "The lowers will be here tommorow for me to start on and the rest of the parts will come trickling in … Back in the day when I first started doing these builds I would have the place I made a purchase from assemble and test fire the uppers for me … Of course as I turned out build after build the practice of paying someone else to do my work ended abruptly." SMITH then wrote "I am beginning a new sweet kitchen island complete with onboard electrical and an invisible stash compartment for the good stuff …"

### J. SMITH arrested for burglary and probation violation

48. On December 5, 2017, NCSO deputies learned that the home of a deceased woman was burglarized by two men seen loading items from her garage into a U-Haul van. Deputies spoke with a sales clerk at the U-Haul store where the van was rented and requested documents regarding the rental. The U-Haul van seen at the burglary was rented to a "Marcus Styles" who verbally provided an address of "14794 Toll Lane" as the clerk heard it. "Marcus" provided a telephone number of "530-213-0141" on the rental application, as well as another address in Alaska. "530-213-0141" is the same telephone number SMITH provided to the UCA in a previous email. The NCSO deputy located a "Marcus Styles" on Facebook, bearing a location of Ketchikan, Alaska, and showed the Facebook profile photo to the U-Haul sales clerk. The clerk confirmed that the person in the Facebook photo, who was seen wearing a bright yellow reflective fishing-style hat, was the same individual who rented the van. The clerk also stated that the same man rented another U-Haul van several days ago.

49. During the NCSO investigation into the burglary, it was determined that a Toyota Highlander bearing California license plate 5BWH912 was associated with the burglary. This is the same Toyota Highlander registered to SMITH's wife, Julie. NCSO deputies arrived at the SUBJECT PREMISES and were greeted by Julie Smith, who upon questioning about the whereabouts of her husband Michael SMITH, advised she wanted a lawyer. While awaiting a search warrant for the SUBJECT PREMISES, deputies observed stolen property from the deceased woman's home at the SUBJECT PREMISES.

50. NCSO deputies executed their search warrant at the SUBJECT PREMISES and found SMITH hiding in the attic. Deputies took SMITH into custody for state misdemeanor burglary charges. Inside the home deputies found more stolen property; a gunsmith room with ammunition, reloading materials, a drill press; and, in total throughout the home, 23 firearms. All of these firearms were seized as SMITH and his wife are both on probation, of which their terms stipulate they are not allowed to possess firearms. Additionally, deputies located the yellow reflective fishing hat worn by "Marcus Styles" in the Facebook photo. SMITH was charged with probation violation in addition to burglary and booked into the Nevada County Jail.



**Photo 9 – Drill press and rifle parts at SUBJECT PREMISES**

### K. SMITH and HSI UCA discuss second meeting date and location

51. On or about December 14, 2017, SMITH notified the UCA that the second order of four short-barreled AR-15s was complete. The UCA replied "I'm still looking at just after New Years to grab them from you … I'd like to grab them as a guy in Germany really wants one of your builds." Regarding the 80% lowers completed, SMITH wrote "These turned out very nice. Polymer carves very clean, beautiful really! I have not done one for quite some time but I am certain that I will never get aluminum for myself again …" The UCA replied "Hopefully if I can get more sales going with these polymers, it will mean more business for both of us." SMITH replied "A regular order would be appreciated, 4 to 8 polymer builds every 2 weeks no problem."

52. SMITH and the UCA agreed to meet on January 4, 2018 at 12:00 pm at the Bass Pro Shops parking lot. Shortly before the arranged meeting time, SMITH emailed the UCA and asked if the UCA could procure a fake ID for SMITH.

### L. SMITH and HSI UCA complete second trade of AR-15s for Bitcoin

53. On January 4, 2018, law enforcement established surveillance at the SUBJECT PREMISES. At the SUBJECT PREMISES, agents observed the White Ford Expedition, the Gold Toyota Highlander, and a third unidentified Black sedan. Eventually SMITH's White Ford

Expedition ("SUBJECT VEHICLE") departed the SUBJECT PREMISES and made its way to the predetermined meeting location at Bass Pro Shops. SMITH arrived alone in the SUBJECT VEHICLE and parked next to the UCA's vehicle. SMITH told the UCA that the rifles were inside a piece of luggage in the rear passenger seat of the SUBJECT VEHICLE. The UCA retrieved the luggage from the SUBJECT VEHICLE and placed it in the UCA's vehicle. The UCA performed a cursory inspection of the rifles with SMITH at his side. None of these firearms were registered nor contained a serial number. No ATF paperwork or background checks were completed.

54.    The UCA sent the remainder of the payment in Bitcoin to an address provided by SMITH, and the two discussed the fake ID requested by SMITH in a previous email. SMITH requested that the fake ID be from the state of Alaska. I know from speaking with NCSO deputies that SMITH's Facebook page under the name "Marcus Styles" listed his location as Ketchikan, Alaska, and that SMITH listed an Alaska address on the U-Haul rental agreement used in the burglary of the deceased woman's home.

55.    The UCA and SMITH discussed future potential trades and SMITH said that he could do eight rifles at a time. The UCA inquired if SMITH was still interested in the explosives, and SMITH said yes but not right now as he ran into a financial pitfall recently. SMITH and the UCA then parted ways.

56.    After the second meet, SMITH sent an email to the UCA asking if the UCA had any trouble on his return trip, writing "Not trying to be nosy but I'm always anxious for anyone I've transferred to."



**Photo 10 – SMITH at the second meeting**



**Photo 11 – SUBJECT VEHICLE at the second meeting**



**Photo 12 – Four short-barreled "ghost" AR-15s received from SMITH**



**Photo 13 – Luggage photo from NCSO search warrant at SUBJECT PREMISES**

57. All four AR-15 rifles were sent to OTTP where they underwent examination and testing. All four rifles test-fired successfully, and all four barrels measured in at 7.5 inches, meeting the definition of a short-barreled rifle per 18 U.S.C. § 921(a)(8).

### M. SMITH and HSI UCA negotiate a third purchase of four short-barreled rifles

58. On or about January 26, 2018, the UCA contacted SMITH regarding the purchase of another four "ghost" short-barreled rifles. SMITH wrote back, saying "… So 4 more polymer bad boys? Sounds like a plan ! Same specs as Last! Right On! I certainly am due for some building. I'm glad to hear your business is doing so Well, hopefully my builds have helped …" The UCA then sent a $2,600 Bitcoin down payment to the Bitcoin address provided by SMITH.

59. SMITH told the UCA that cash would be preferable for the remainder of the payment due to losing some money to Bitcoin miner fees in the transaction. SMITH went on to say that all the parts are ordered for the third set of AR-15s. SMITH then talked about the hidden compartment he is building in a kitchen island and offered to produce one for the UCA. SMITH detailed that the dimensions of the compartment of the hidden stash in the kitchen island are 25" wide x 60" long x 4.5" deep, saying "You could fit a shitload of contraband in that space … Also I know that LE pays no attention to one of these cause my in-laws have one and LE came to their house looking for my wife's sibling and tore their place apart searching for him. But as they leaned their fat asses on it and clipboards on top of it they were unaware of what lay below. Several felonies is what I was told! …"

60.   SMITH and the UCA set a meeting date of February 15, 2018 for the third transfer of short-barreled AR-15s.

## VI.   CHARACTERISTICS OF FIREARMS TRAFFICKERS

61.   I know from my training, experience, and discussions with other experience law enforcement officials that firearm traffickers and/or manufacturers frequently possess the following evidence of their unlawful activity in their residences, places of employment, storage units, vehicles, electronic devices, and on their persons:

    a.   Firearms, lower receivers, upper receivers, grips, stocks, magazines, magazine repair kits, trigger assemblies, variant lower receivers, and barrels;

    b.   Information concerning where and from whom the trafficker/manufacturer purchased firearms or firearm parts;

    c.   Information concerning where and to whom the trafficker/manufacturer sold firearms or firearm parts;

    d.   Firearm records (purchase/sale, method of payment), notes or other documentation concerning profits made (i.e., comparing cost of purchase vs. cost of sale);

    e.   Customer files and lists related to the services provided or firearm sales;

    f.   Records and/or documents provided to customers in connection with the services provided or firearms;

    g.   Correspondence to and/or from actual or prospective customers or suppliers;

    h.   Records and/or documents reflecting or related to the purchase of equipment, materials, or supplies for the operation of the business;

    i.   Records and/or documents of mailings, shipping or delivery, whether by the United States Postal Service or other private delivery services;

    j.   Information concerning methods used to advertise the availability of their firearms or firearm parts for purchase;

    k.   Photos of their firearms or firearm parts for purposes of advertising for sale, to keep track of their inventory, for insurance in case of theft, etc.;

    l.   Written, recorded oral, or digital communications with associates involved in the purchase/sale of firearms or firearm parts;

    m.   Written statements showing profits made from the sale of firearms or firearm parts for internal purposes;

    n.   Bank deposit records, checking account records, and other financial documentation showing the purchase of firearms or firearm parts, the securing of cash to purchase firearms, and the depositing of cash proceeds from the sale of firearms;

    o.   Other records and/or documents which appear to be related to the business including, but not limited to notes, internal correspondence, external correspondence, memoranda, directives, organizational charts;

p. Cell phone records which show the phone number and subscriber information, and numbers called/received;

q. Indicia of persons in control over a premises where the above items are found, including addressed mail, material in the premises with personal identification information, photographs of persons in or about the location, etc;

r. Tools and equipment associated with the manufacture of firearms, including CNC machines, drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws;

s. Templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

t. Cash received from the sales of firearms; and,

u. Electronic devices, including cellular telephones, tablets and computers, used to communicate regarding firearms transactions, conduct related research, and maintain records of the purchase and sale of firearms.

62. I know from my training and experience and discussions with experience law enforcement officers, that individuals that own firearms store the firearms in safes, gun safes, locked cabinets, and/or other secured containers. I also know that individuals that possess firearms typically store their firearms in their homes. They store their firearms in their homes for a number of reasons, including, to safely and securely store the firearm, for quick access to the firearm for personal and property protection, and for convenient access for use of firearms for sporting purposes.

63. Through my training, experience, and discussions with other law enforcement officers, I know that individuals who traffic firearms for profit normally maintain records of their financial activities in their residence, including receipts for expenditures by cash and check, bank records, and other financial documents. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business and often use accountants to complete financial statements and tax returns for their business and personal returns both in the business and their home.

64. I know that firearm traffickers and/or manufacturers, as well as criminal co-conspirators generally, use cellular telephones to communicate with one another, either by voice or text message. Cellular telephones are digital devices that preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other firearm traffickers and/or manufacturers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Cellular telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by firearm traffickers and/or manufacturers is evidence of the associations of the firearm traffickers and/or manufacturers, some of which are related to his or her illegal business. Cellular telephones also contain in their

memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a firearm trafficker's and/or manufacturer's mobile telephone can contain evidence of firearm trafficking and/or manufacturing because it shows the communications or planned communications of a firearm trafficker and/or manufacturer and the telephone numbers of those with whom the firearm trafficker and/or manufacturer communicated or intended to communicate. Cellular telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Firearms traffickers and/or manufacturers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Cellular telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by firearm traffickers and/or manufacturers. Cellular telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a firearms trafficker who took pictures of evidence of crime. Cellular telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

65.    In my experience and consultation with other law enforcement officers, firearm traffickers and/or manufacturers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

66.    Repeated firearm trafficking and/or manufacturing activity over lengthy periods of time generates greater amounts of evidence. Many items of evidentiary value, particularly computer and documentary evidence, are not illegal to possess and, therefore, not overtly incriminating in the criminal's view. It is also a common practice for firearm traffickers and/or manufacturers to maintain personal property used or obtained in their criminal activities and which constitute evidence of their crimes for extended periods of time.

67.    As a result of my experience and training, I have learned that firearm traffickers and/or manufacturers maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators and these records may be kept on paper or contained in digital storage devices. It is also my experience that these traffickers and/or manufacturers tend to keep these accounts and records in their residence and in the areas under their control. It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. *See United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991).

68.    Based upon my training and experience, the above-described documentary evidence can be in paper form, or may be in digital form stored on computers, smart phones, digital notebooks,

personal computers or any other type of digital storage device (e.g. thumb drives, external hard drives, etc.). Although the above-described material and the devices holding the material would most likely be in their residence, it is also often found in their personal vehicles, in their personal work areas (desks, lockers, etc.) where they work, and/or rented storage lockers. In addition, since many persons these days carry their cellular telephones and, sometimes, digital notebooks, laptop computers, on their persons, it is often necessary to search and seize these items from the firearm trafficker's and/or manufacturer's person to secure this evidence.

69.    I know, based on my training, experience, and consultation with other law enforcement officers, that the number of firearm traffickers and/or manufacturers using computers and electronic information storage devices, like the general population as a whole, is steadily increasing, and such computer hardware, software, documentation, passwords, and electronic information storage devices may be instrumentalities, fruits, or evidence of crimes. Moreover, such computers and electronic information storage devices offer firearm traffickers and/or manufacturers and distributors convenient devices for recording information concerning firearms, including sources, co-conspirators and customers, records of purchases and sales, and any other information deemed pertinent by the firearm traffickers and/or manufacturers and distributor. Much of the electronic media storage devices, such as floppy disks, zip disks, thumb drives, CD-ROMs, SD memory cards, are very small, detachable, portable, and can be secreted in small containers, such as safes and clothing pockets. I also know, based on my training and experience, that firearm traffickers and/or manufacturers often communicate with their criminal associates and with potential buyers through the use of electronic mail, instant messaging, text messaging, telephone answering machines, voicemail, pagers, and telephones (cellular and land line). To the firearm traffickers and/or manufacturers, these communication devices are part of their normal business equipment.

70.    Accordingly, based on this investigation and my training and experience, I believe that items listed in Attachment B will be found on the persons and in the vehicles and locations listed in Attachment A.

71.    Additionally, based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

## VII.    CONCLUSION

72.    Based on the facts set forth in this Affidavit, I believe there is probable cause that evidence, fruits, proceeds, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) –

dealing/manufacturing firearms without a license are concealed in the locations identified in Attachment A. Accordingly, I respectfully request the issuance of the criminal complaint and arrest warrant for MICHAEL SMITH, and the issuance of search warrants authorizing the search of the locations described in Attachment A, as well as the seizure of the items described in Attachment B.

## VIII.  **REQUEST FOR SEALING**

73.    This Affidavit contains information regarding a potential target. In light of the ongoing nature of the investigation, and the likelihood that notice to the above-identified individual may cause him to destroy evidence, flee from prosecution, and notify confederates, I request that this Affidavit and the resulting search and arrest warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and a copy of the search and arrest warrants and an inventory of any items seized that will be left at the locations of the execution of the warrants.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.


Aron Mann
Special Agent
Homeland Security Investigations

Approved as to form:


Justin Lee
Assistant United States Attorney


Sworn and Subscribed to me on February 14, 2018,


Hon. EDMUND F. BRENNAN
United States Magistrate Judge
Eastern District of California

## ATTACHMENT A

### *Description of the Location to be Searched*

The home and premises of Michael SMITH, located at 14793 Towle Lane, Grass Valley,
California ("SUBJECT PREMISES").





The SUBJECT PREMISES is a 1,776 square foot, single story residence with white siding
exterior and light blue trim and light blue roofing. The residence is located on the east side of
Towle Lane, has a west facing entrance. The front door to the residence is secured with a black
iron security door. In the rear of the premises there are three wooden sheds and other makeshift
storage units. A parked trailer sits in the front of the residence near Towle Lane.

The authority to search this location includes:

1. 1997 White Ford Expedition bearing California license plate 7NAA603, registered to Julie SMITH at 14793 Towle Lane, Grass Valley, California.

2. 2003 Gold Toyota Highlander bearing California license plate 5BWH912, registered to Julie SMITH at 14793 Towle Lane, Grass Valley, California.

3. A Cream colored trailer bearing California license plate 4CB5489, registered to Michael SMITH or Julie SMITH at 14793 Towle Lane, Grass Valley, California.

4. The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises. Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

## ATTACHMENT B

### *List of Items to be Seized*

The following items constitute evidence, fruits, proceeds, and instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (dealing/manufacturing firearms without a license) and 26 U.S.C. § 5861 (possession/transfer of an unregistered firearm).

1. Any firearms or firearm blanks of any kind (including AR-15-style blanks).

2. Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and barrels for firearms.

3. Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

4. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B.

5. Records relating to the acquisition and distribution and repair of firearms, firearms parts, tools and/or equipment associated with the manufacture of machineguns, short barreled rifles and/or other firearms, including but not limited to ATF Forms 4473, California Dealer Of Record Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets.

6. Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tends to establish communication between co-conspirators, whether such documents are stored in documentary or electronic form.

7. Digital evidence of items described in Attachment B

8. Evidence and records relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing, whether such documents are stored in documentary or electronic form.

9. United States currency in excess of $2,000, including any and all financial records to facilitate the investigation of the laundering of illicitly obtained monies and/or other forms of assets, including United States currency acquired through the sales, trafficking, or manufacturing of illegal firearms.

10. Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them, whether such documents are stored in documentary or electronic form.

11. Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents, whether such documents are stored in documentary or electronic form.

12. Any safes, locked cabinets, and/or other secured containers and/or devices at the locations and in/on vehicles identified in Attachment A. Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.

13. Any vehicles and mobile conveyances used and/or associated with unlawful trafficking and manufacturing of firearms, including transporting of any such firearms, firearm parts, or blanks.

14. Any computer numerical control ("CNC") machines and/or parts/tools associated with the use and/or association of the manufacturing and/or modifying of firearms, firearm parts, AR-15 blanks (and firearm blanks of any kind) machineguns and/or machinegun parts including but not limited to templates, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

15. The contents of any surveillance camera or surveillance system used at any of the locations identified in Attachment A.

16. Personal computers, tablets, cellular telephones, encryption devices, paging devices, beepers, and other devices used for wire or electronic communications.

17. Any Bitcoin wallet addresses, seed words, accounts and passwords, or other information necessary to access Bitcoin accounts and wallets, whether such data and documents are stored in documentary or electronic form.

18. Any user names, passwords, text files, encryption codes, or other information necessary to access Dark Web marketplaces or encrypted email accounts, whether such data documents are stored in documentary or electronic form.